UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 24cr10322 |
| | Violation: |
| v. | Count One: Conspiracy to Commit Health Care Fraud<br>(18 U.S.C. § 1349) |
| KENNETH FISHBERGER, | |
| Defendant. | Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(7)) |

INFORMATION

At all times relevant to this Information:

GENERAL ALLEGATIONS

1. Defendant KENNETH FISHBERGER was a 75-year-old resident of Setauket, New York. FISHBERGER has been licensed as a medical doctor in the State of New York for approximately 47 years. FISHBERGER practiced internal medicine in and around Port Jefferson, New York.

2. Coconspirator Company Manager ("CC-1") was the head salesperson for a medical diagnostics company ("TCD Company") that employed technicians to perform transcranial Doppler ("TCD") ultrasounds in doctors' offices and at its own office. CC-1 paid bribes on behalf of the TCD Company to induce doctors, including FISHBERGER, to order TCD ultrasounds that TCD Company submitted to Medicare and other insurance companies for payment based on fraudulent diagnoses.

3. Coconspirator Company Representative (CC-2) was a salesperson for TCD Company. CC-2 paid bribes on behalf of the TCD Company to induce doctors, including

FISHBERGER, to order TCD ultrasounds that TCD Company submitted to Medicare and other insurance companies for payment based on fraudulent diagnoses.

4. Medicare was a federally funded health care program providing benefits to persons who are 65 years of age or older or disabled. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), administered Medicare. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

5. Medicare was a "health care benefit program" as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

6. Medicare Part B paid for medically necessary outpatient medical services. Medicare authorized payment for outpatient services if the care was actually provided and was medically necessary; that is, the services were required because of disease, disability, infirmity, or impairment. Medicare would not pay for services and treatment that were not actually provided or for which that patient did not meet the criteria necessary to justify the claimed service or treatment.

7. By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement, and furthermore, certified that they would not knowingly present, or cause to be presented, false and fraudulent claims. To participate as a Medicare provider and receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act,

and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors.

8.   Upon certification, the medical provider, whether a clinic or an individual, was assigned a provider identification number for Medicare billing purposes (referred to as an "NPI"). When the medical provider rendered a service, the provider submitted or caused the submission of a claim for reimbursement to the Medicare contractor or carrier that included the NPI assigned to that medical provider.

9.   To receive reimbursement for a covered service from Medicare, a provider was required to submit a claim, either electronically or using a form (*e.g.*, a CMS-1500 form or UB-92) containing the required information appropriately identifying the provider, patient, and services rendered.

10.   Health care providers were given, and provided with online access to, Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations. Providers could only submit claims to Medicare for services they rendered, and providers were required to maintain patient records to verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider. Among other things, the requirements included providing an accurate diagnosis and the nature of illness that was being treated.

11.   Under the Social Security Act, for any item or service to be covered by Medicare, it must have (1) been eligible for a defined Medicare benefit category, (2) been reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a

malformed body member, and (3) met all other applicable Medicare statutory and regulatory requirements. *See* 42 U.S.C. § 1395.

12. Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted or whose submission was caused by the physician. Medicare required complete and accurate patient medical records so that Medicare could verify that the services described on the claim form were provided. These records were required to permit Medicare to review the appropriateness of Medicare payments made to the health care provider.

## The Federal Anti-Kickback Statute

13. To enroll as a Medicare provider, Medicare required providers to abide by Medicare laws, regulations, and program instructions. Medicare further required providers to certify that they understood that a payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Accordingly, Medicare would not pay claims procured through kickbacks and bribes.

## Transcranial Doppler Ultrasounds

14. A TCD ultrasound was a noninvasive diagnostic test that could be used to estimate the blood flow through certain blood vessels in the brain by bouncing high-frequency sound waves off blood vessels.

15.     Medicare contractors may issue Local Coverage Determinations ("LCDs") that set forth when certain items or services are considered medically necessary (and thus covered) or medically unnecessary (and thus not covered). During the relevant period, Medicare contractors issued LCDs for non-invasive vascular studies, which included TCD ultrasounds.

16.     The LCDs generally set forth that non-invasive vascular studies were medically unnecessary unless (1) significant signs/symptoms of arterial or venous disease were present; (2) the information was necessary for appropriate medical and/or surgical management; and/or (3) the test was not redundant of other diagnostic procedures that must have been performed.

17.     LCD 27355, which was applicable in New York, among other states (including, as of October 18, 2013, Massachusetts), to services performed between in or about June 2013 through in or about September 2015, set forth only eight medical reasons for which Medicare would pay for TCD ultrasounds, which could include Healthcare Common Procedure Coding System ("HCPCS") procedure codes 93886 (Transcranial Doppler study of the intracranial arteries; complete), 93890 (vasoreactivity study), and 93892 (emboli detection without intravenous microbubble injection).[1] These medical reasons were generally limited to suspected or actual significant blockages of the blood vessels in the brain, blood flow for patients with suspected brain death or undergoing certain operations, and conditions relating to aneurysms in the brain. These diagnoses generally included neurovascular conditions such as cerebral infarctions due to embolisms, brain death, vertebro-basilar artery syndrome (or vertebro-basilar

---

[1] LCD 27355 was replaced by LCD 33627 to reflect an updated version of the national reference for diagnostic codes. The coverage criteria for TCD ultrasounds generally did not change.

5

artery insufficiency) ("VBI"), or occlusion or stenosis of cerebral arteries, as well as conditions relating to sickle-cell disease.

18.     Federal regulations required that diagnostic tests could only be ordered by the physician who was treating a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. 42 C.F.R. § 410.32(a). Tests ordered by the physician who was not treating the beneficiary were not reasonable and necessary.

19.     Medicare only covered a limited set of preventative services, which, in the context of diagnostic tests, were commonly referred to as screening tests. The screening tests permitted under Medicare's rules, regulations, policies, and procedures did not include TCD ultrasounds.

20.     Private insurance companies' coverage criteria were generally similar to those contained in the Medicare LCDs.

## Overview of the Health Care Fraud Conspiracy

21.     From at least June 2013 to in or about December 2019, FISHBERGER, CC-1, and CC-2, together with others known and unknown, devised and executed a scheme to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, by causing the submission of materially false and fraudulent claims.

22.     Beginning in or about June 2013, FISHBERGER entered into an agreement with CC-1 in which he agreed to refer patients for TCD ultrasounds using false diagnoses in exchange for approximately $100 in cash for each patient referred for TCD ultrasounds.

23.     From at least June 2013 to in or about December 2019, FISHBERGER signed hundreds of orders for medically unnecessary TCD ultrasounds using false diagnoses to cause Medicare and private insurance companies to pay for the testing.

24.     FISHBERGER was aware that TCD Company, for much of the alleged conspiracy period, operated in Massachusetts. TCD Company, CC-1, and others affiliated with TCD Company engaged in similar conduct in Massachusetts that is part of the charged conspiracies.

### Object and Purpose of the Healthcare Fraud Conspiracy

25.     The object and purpose of the conspiracy was for FISHBERGER, CC-1, and CC-2, to unlawfully enrich themselves and others and to defraud health insurance plans of money by falsifying patient diagnoses when ordering unnecessary medical testing, and thereby causing the submission of materially false and fraudulent claims for those services to be submitted in exchange for kickbacks.

### Manner and Means of the Healthcare Fraud Conspiracy

26.     The manner and means by which FISHBERGER, CC-1, CC-2, and coconspirators known and unknown, carried out the conspiracy and the scheme to defraud were the following:

   a. Ordering TCD ultrasounds that were not medically necessary;

   b. Falsifying patient diagnoses when ordering the TCD ultrasounds to cause Medicare and private insurance companies to pay for the testing;

7

    c. Soliciting and receiving cash and check kickback payments in exchange for ordering the TCD ultrasounds;

    d. Billing Medicare and private insurance companies for approximately $891,978 in fraudulent claims; and

    e. Paying and receiving approximately $48,000 in kickbacks.

<u>Acts in Furtherance of the Healthcare Fraud Conspiracy</u>

27. FISHBERGER and others known and unknown carried out the following acts in furtherance of the healthcare fraud conspiracy and scheme to defraud:

    a. On or around September 10, 2013, CC-1 exchanged text messages with an individual who worked in FISHBERGER's office about delivering a cash kickback payment, including for TCD ultrasounds FISHBERGER ordered from TCD Company.

    b. On or around March 6, 2014, CC-1 sent text messages to the same individual who worked in FISHBERGER's office that FISHBERGER should "write TCD for migraines and headaches which is transient cerebral ischemia on exam request. Also SSR for all diabetics. They have the same value as a carotid. 93 vs 140 last month."

    c. On or about March 14, 2016, CC-1 delivered a cash kickback payment to FISHBERGER, including for TCD ultrasounds FISHBERGER ordered from TCD Company.

    d. On or about April 12, 2017, FISHBERGER ordered a TCD ultrasound for a patient with the initials J.B., which included the false diagnosis of VBI.

    e. On or about June 1, 2017, CC-2 delivered a cash kickback payment to FISHBERGER, including for TCD ultrasounds FISHBERGER ordered from TCD Company.

f.  On or about December 19, 2019, CC-1 made a cash kickback payment to FISHBERGER of approximately $900 near a Starbucks, including for TCD ultrasounds FISHBERGER ordered from TCD Company.

## COUNT ONE
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

The United States Attorney charges that:

28. The United States re-alleges and incorporates by reference paragraphs 1-27.

29. From in or about at least June 2013 to in or about December 2019, in the District of Massachusetts and elsewhere, the defendant,

### KENNETH FISHBERGER,

conspired with others known and unknown to the United States to commit health care fraud, that is, to knowingly execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain moneys, funds, credits, assets, securities and other property owned by and under the custody and control health care benefit programs, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

30. Upon conviction of the offense in violation of Title 18, United States Code, Sections 1349, set forth in Count One, the defendant,

### KENNETH FISHBERGER

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The property to be forfeited includes, but is not limited to, the following:

    a. $48,000 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

31. If any of the property described in Paragraph 30, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant—

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 30 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

                JOSHUA S. LEVY
                Acting United States Attorney

By:   */s/ Howard Locker*
       HOWARD LOCKER
       Assistant U.S. Attorney

Date: October 23, 2024